Fabricant, Judith, J.
This action arises out of the settlement of medical malpractice claims against clinicians affiliated with the plaintiff UMass Memorial Health Care, Inc. (UMMHC). UMMHC seeks indemnification from two of its excess insurers, Lexington Insurance Company (Lexington) and First Specialty Insurance Corporation (First Specialty), and also asserts damages claims against its insurance broker, Marsh USA. Before the Court is First Specialty’s motion for summary judgment. For reasons that will be explained, First Specialty’s motion will be denied.
BACKGROUND
The event underlying the action is the birth of J acob Hanks at UMass Memorial Medical Center, a UMMHC affiliate, on December 29, 2000. Complications occurred, and Jacob suffered brain damage, allegedly as a result of malpractice. Jacob’s parents filed three actions against UMMHC personnel, one in a Massachusetts court in December of 2003, one in federal court in December of 2006, and a third in a Massachusetts court in February of 2007. All three cases settled in February 2008, for $4.9 million. Defense costs totaled $1,034,140. The issues presented in this case involve allocation of those amounts between UMMHC and its various insurers.[2]
UMMHC has a complex insurance scheme, only certain aspects of which bear on the present motion. All the relevant policies run from October 1 of each year, and all are so-called “claims made” policies, meaning that coverage under a particular policy depends on whether the insurer first receives notice of the claim, or of circumstances likely to give rise to a claim, within the policy period. UMMHC obtains its primary layer of insurance from an entity known as Commonwealth Professional Assurance Company (CRAC). CPAC is a so-called “captive” insurance company of UMMHC; that is, it is a wholly owned subsidiary of UMMHC and, with minor exceptions, insures only UMMHC and affiliated persons and entities.[3]
The CPAC policies place responsibility for claims handling and defense on UMMHC, with indemnity obligations on CPAC up to specified policy limits. UMMHC and CPAC periodically make electronic transfers to reconcile amounts due from one to the other for premiums, indemnity, and defense costs. The CPAC policy in effect for the 2000-2001 policy year provided coverage of up to $2.5 million for each medical incident. The 2002-2003 and 2003-2004 policies provided coverage up to $5 million. .
UMMHC also maintains several layers of excess liability coverage. The first layer, which provides aggregate coverage of $5 million above that provided by CPAC, is a “quota share” program, in which multiple insurers participate, with each responsible for a specified percentage of that layer. For the 2001 -2002 policy year, First Specialty held responsibility for 27 percent of this excess layer. Under its policies, First Specialty agreed to indemnify the insured for “loss” in excess of the limit of underlying insurance, with loss defined as “amounts paid, net of all recoveries and salvages, in settlement of claims or in satisfaction of awards or judgments, incurred as a result of a loss event to which this insurance applies.” “Loss event” is defined, in turn, as the “happening, situation or circumstance that initiates the application of the immediate underlying insurance” set forth in a schedule attached to the policy. The schedule identifies the underlying insurance for medical professional liability as the CPAC policy for that year, with its $2.5 million limit.
UMMHC recognized and documented the potential for claims promptly after Jacob Hanks’s birth in late 2000. When it received service of the first lawsuit in 2003, it believed, based on its understanding of its own records and information from Marsh, that notice had not been given to the insurers, so that it would be unable to claim coverage under earlier policies. UMMHC and CPAC therefore treated the claim as first made during the 2003-2004 policy period, when the CPAC policy had a limit of $5 million. UMMHC bore *528 the expense of defense of the claims, pursuant to the terms of the CPAC policy, and pursued settlement through CPAC based on the 2003-2004 policy.
The settlement agreement that resolved the Hanks suits identified the parties to it as: Jacob Hanks and his parents and guardian ad litem as “Plaintiffs/Re-leasors"; seven named clinicians as “Defendants/Re-leasees”; and CPAC and American Casually Company as “Insurers/Releasees.”[4] The agreement recited that “Insurers/Releasees are the liability insurers of their Defendants/Releasees, and, as such, would be obligated to pay any claim made or judgment obtained against their Defendant/Releasees which is covered by its policies with their Defendants/Releasees.” It set forth releases encompassing the named defendants and their employers, including UMMHC, and the insurers. The agreement then identified the payments to be made, specifying amounts to be paid by CPAC in various forms, some by the purchase of annuities. CPAC signed, through an individual identified as “Medical Director of Self Insurance.” UMMHC did not sign. CPAC then entered into agreements with other entities to purchase annuities to meet certain of its obligations under the settlement agreement. UMMHC funded the settlement, and also bore the costs of defense; it thus paid out a total of $5,934,140. It received a total of $1,515,974 from other insurers that are not involved in the present dispute.[5]
While the Hanks suits were pending, UMMHC identified documentation leading it to believe that it had notified Marsh of the Hanks incident within the 2001-2002 policy period, and had directed Marsh to notify the insurers. The giving of such notice to the insurers at that time would have brought the claim within the policies for that year, in which the CPAC policy limit was $2.5 million, rather than the $5 million limit under the 2003-2004 policy. The effect of that difference would have been to lower the threshold for coverage under the excess policies from $5 million to $2.5. The $2.5 million savings to CPAC would have inured to its parent, UMMHC.
UMMHC brought his action, initially against Marsh alone, in January of 2009, alleging that Marsh had negligently failed to give timely notice to the insurers; on that basis, UMMHC sought to recover the $2.5 million from Marsh. In its answer to the complaint, Marsh alleged that it did give notice to the insurers on the last day of the 2001-2002 policy period. UMMHC then made demand on two excess insurers, First Specialty (the moving party here), and Lexington, seeking coverage under the 2001-2002 policies. Both denied coverage, leading UMMHC to join them in this action. For present purposes, all agree that the factual issue of whether the insurers received notice within the period of the 2001-2002 policies is a matter of genuine dispute.
First Specialty’s motion rests on the theory that, regardless of whether it did or did not receive notice, it has no liability because UMMHC has suffered no loss, since CPAC paid the settlement. The amount CPAC paid, combined with the amounts UMMHC received from other insurers, First Specially points out, exceeded the total of the settlement and defense costs by $481,834, leaving UMMHC with no negative balance, and indeed, a windfall. UMMHC responds, in substance, that CPAC’s payments came from UMMHC, and count as its loss; its insurance arrangement through CPAC, it argues, is in substance merely self-insurance, so that any payment by CPAC is a loss to UMMHC. As a fall-back position, UMMHC argues that it could agree with CPAC that application of the 2003-2004 policy was in error and should be rescinded, and that the claim should be covered under the 2001-2002 policy with its $2.5 million limit, with the result that UMMHC would refund $2.5 million to CPAC.[6] That scenario, UMMHC argues, would result in a loss of $2.5 million to UMMHC, for which the excess insurers are liable under their 2001-2002 policies.
Two “conditions” set forth in the First Specialty policy bear on these arguments. Paragraph I.M provides: “If other insurance not afforded by the company is available to the insured covering a loss event also covered hereunder, the insurance hereunder shall be excess of, and not contribute with, such other insurance.” “Other insurance” is defined to include “coverage or benefits provided by self-insurance arrangements, . . .self insurance trusts, captive insurance companies, mutual insurance companies, stock insurance companies, risk-retention groups, reciprocal exchanges, mutual benefit or assistance programs, or any other plan or agreement of risk assumption.”
Paragraph 1.0 provides:
The named insured agrees that the underlying insurance . . . shall be maintained in force during the currency of this policy, without alteration of its terms and conditions and without reduction of coverage or limits of liability ... If the insured fails to maintain such underlying insurance in force or to meet all the terms and conditions of such underlying insurance, the insurance afforded by this policy shall apply in the same manner as if such policies had been maintained in force.
DISCUSSION
Summary judgment will be granted when no genuine dispute exists as to any material fact and the moving party is entitled to judgment as a matter oflaw. See Mass.R.Civ.P. 56; Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). In deciding a motion for summary judgment, the court may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Mass.R.Civ.P. 56(c); Community Nat’l Bank, 369 Mass. at 553. The Court views the facts “in the light most *529 favorable to [the non-moving party], taking all the facts set forth in its supporting affidavits as true.” G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond with evidence of specific facts that establish the existence of a genuine issue of material fact. Mass.R.Civ.P. 56(e); see Madsen v. Erwin, 395 Mass. 715, 719 (1985); Godbout v. Cousens, 396 Mass. 254, 261 (1985).
Where the Court must interpret the terms of an insurance policy, as is the case here, such interpretation is a question of law for the court, Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 146 (1982); where the terms of the policy are unambiguous, its interpretation is appropriate for summary judgment. Sullivan v. Southland Life Ins. Co., 67 Mass.App.Ct. 439, 442 (2006). Where the provisions of an insurance policy are plainly expressed, the policy must be enforced in accordance with its terms, Cody, 387 Mass. at 146, and interpreted in a manner consistent with what an objectively reasonable insured would expect to be covered. McGregor v. Allamerica Ins. Co., 449 Mass. 400, 402 (2007); City Fuel Corp. v. National Ins. Co. of Hartford, 446 Mass. 638, 642-43 (2006).
1. The Loss
First Specialty’s primary theory is that UMMHC has suffered no loss within the meaning of the policy, because the recoveries it has received, including indemnification from CPAC and from the other insurers, exceed the amounts it paid — that is, there is no loss net of recoveries. UMMHC responds that “amounts paid by CPAC would not be a ‘recovery’ by UMMHC in any sense of that word, given that CPAC is wholly-owned by UMMHC . . . Nor does the term ‘recoveries’ . . . encompass payments made by UMMHC itself, even if made via its captive insurer.” UMMHC points out also that the First Specialty policy covers only losses “in excess of the underlying limit of liability”; if indemnity from the underlying policy were to be treated as a recovery, to be subtracted before determining the net amount of the loss, and then subtracted again to determine whether the loss exceeds the underlying limit, it would be counted twice.
The first of these arguments, in the Court’s view, ignores the plain language of the policy, particularly the definition of “other insurance,” quoted supra, which expressly includes both self-insurance and captive insurance. This language leaves no doubt that First Specialty and UMMHC, in negotiating the policy, contemplated the possibility of both captive and self-insurance, and agreed to treat both as insurance, just like any other insurance. Thus, the relationship between UMMHC and CPAC is irrelevant, and it makes no difference whether CPAC or UMMHC itself funded the payments; indemnity from CPAC has the same status, for purposes of the First Specialty policy, as would indemnity from any other underlying (or primary) policy.
UMMHC’s second argument on this issue, however, is well taken. The loss to be covered under the policy is loss “in excess of the underlying limit” — that is, loss after subtracting the amount of the primary coverage, whether that coverage is from a captive, or from an independent insurer, or by way of a self-insured retention. Thus, the 2001-2002 First Specialty policy would provide no coverage until UMMHC had suffered a loss exceeding $2.5 million, the amount of the underlying insurance specified in that policy. If indemnity in that amount from CPAC under the underlying policy were also treated as a recovery, and subtracted from UMMHC’s loss to determine the net loss, it would be counted twice. In that event, UMMHC would have to suffer a loss exceeding $5 million before First Specialty would cover, even though it contracted to cover the net amount of the loss in excess of $2.5. The Court concludes, therefore, that indemnity under the underlying policy is not a recovery for purposes of determining the amount of UMMHC’s loss.
First Specialty next argues that UMMHC did not suffer a loss within the meaning of its 2001-2002 policy, because the “loss event” did not “initiate! ] the application of the immediate underlying insurance,” since CPAC applied its 2003-2004 policy rather than its 2001-2002 policy, the one specified as the underlying policy. This argument strains the policy language and ignores its purposes. The definition of “loss event” by reference to the underlying insurance policy limits the risks covered to those that fall within the coverage of the underlying policy, and establishes the level of loss at which the excess policy applies. Here, there is no question that the “loss event” was the injury to Jacob Hanks allegedly resulting from medical malpractice, an event indisputably within the scope of the underlying insurance, assuming proper notice. The fortuity that CPAC instead applied its 2003-2004 policy is essentially a matter of administration between UMMHC and CPAC; it had no effect on the interests of First Specialty that the definition of loss serves to protect.
The Court therefore reads the definition of loss as encompassing the loss in issue here. It follows that UMMHC did suffer a loss, net of recoveries from other sources, in the amount of $4,418,166 ($5,934,140 minus the $1,515,974 received from other insurers).[7] That loss exceeds the $2.5 million underlying limit of liability in the 2001-2002 First Specialty policy by $1,918,166.
First Specialty suggests that UMMHC chose to treat the claim as falling within the 2003-2004 policy period, and that UMMHC is bound by that choice, so that it cannot now seek recovery from First Specialty under *530 its 2001-2002 policy. The Court is not persuaded. The factual record does not indicate that UMMHC made any election among apparently available policies. To the contrary, the record presently before the Court, on this summary judgment motion, considered in the light most favorable to UMMHC as the non-moving party, indicates that UMMHC sought the coverage it believed to be available based on notices given. More to the point, First Specialty’s obligations are defined by its policy. If, as the Court must assume for this purpose, First Specialty received notice within the 2001-2002 policy period, then it is bound by its obligation under that policy to its share of coverage for losses exceeding $2.5 million.
2. Payments from the London Insurers
UMMHC argues that the payments made by the London Insurers are not “recoveries” within the meaning of the policy, and should not be subtracted from its loss to determine its net loss. The term “recoveries,” it argues, is limited to amounts the insured recovers on affirmative claims, such as for contribution, indemnification from third parties, or subrogation, and does not encompass indemnity payments received from its own insurers. The policy does not define “recoveries,” and UMMHC cites no policy language or authority for its interpretation.
Underlying UMMHC’s argument on this point seems to be the suggestion that, if the full amount received from the London Insurers is subtracted, First Specialty will pay less than its quota share. If that is so, the detriment is not to UMMHC, but to the London Insurers. UMMHC is entitled to be indemnified for its loss above the underlying limit once, but only once. See Rubenstein v. Royal Ins. Co. of America, 44 Mass.App.Ct. 842, 856 (1998). If UMMHC (through Marsh) gave notice to its excess insurers within a policy period for which its underlying coverage was limited to $2.5 million, then it is entitled to receive a total of $3,395,685 ($3,434,140 minus the $38,455 received American Casualty) from its excess insurers as a group, but not more. It has already received $1,477,519 from some of the excess insurers; the balance remaining is $1,918,166. Any greater recovery in this action would be a windfall.
UMMHC argues that the “other insurance” provision of the First Specialty policy does not provide a basis for subtraction of the amounts received from the London Insurers, because it addresses only concurrent policies, not those for different periods, see Boston Gas Co. v. Century Indemnity Co., 454 Mass. 337, 361-62 (2009), and because corresponding provisions in the other excess policies cancel it out. See Mission Ins. Co. v. United States Fire Ins. Co., 401 Mass. 492, 496 n.3 (1988). The argument is a straw man. The payment from the London Insurers is to be subtracted not because it is “other insurance,” but because it is a recovery for purposes of determining the net loss. The cases cited do not address the meaning of “recoveries,” nor does anything in them suggest that an insured is entitled to receive multiple payments for the same loss. Whether the London Insurers might have some sort of claim against the other excess carriers is not before the Court, and does not affect the rights of the present parties as to each other. The Court therefore concludes that the payments from the London Insurers are properly subtracted to determine UMMHC’s net loss. UMMHC’s net loss exceeds $2.5 million by $1,918,166. If First Specialty received notice of the claim within the period of its 2001-2005 policy, it is liable to UMMHC for its share of that amount.
CONCLUSION AND ORDER
For the reasons stated, Defendant First Specialty Insurance Corporation’s Motion for Summary Judgment is DENIED.

 The claims against Marsh are contingent on the outcome as to the excess insurers; UMMHC seeks to recover from Marsh if its claims against the insurers fail.

 It appears that CPAC also insures certain programs of UMass Medical School, and a small number of physicians who attend at affiliated hospitals but are not employees.

 American Casualty had a separate policy covering one of the clinicians.

 $1,477,519 from the so-called “London Insurers,” under an excess policy for the 2000-2001 year, during which those insurers received notice through a routine claim review that included UMMHC’s documentation of the potential claim, and $38,455 from American Casualty.

 Such a refund would not involve any actual transfer of funds, but would be entirely a matter of bookkeeping as between UMMHC and CPAC, its subsidiaiy.

 UMMHC argues that the amount received from the London Insurers should not be subtracted. The Court will address that issue infra.